Edper requires federal courts to honor objectively reasonable judgment calls of their state counterparts. And when state judges apply highly discretionary standards, such as the Barker Factors or the But that wasn't the district court's approach to this habeas case. Here, a jury convicted Petitioner just over two years after he shot his victim. On speedy trial, the state court found both sides contributed to the pre-trial delay, and Petitioner's story about a missing witness known only as Ron Ron failed to prove prejudice. On collateral review, the state court denied Petitioner's ineffective assistance claim tied to his Ron Ron story. Later, on habeas review, the federal magistrate credited the state court's fair-minded decisions and recommended dismissal. But then the district court flipped Edper on its head. The court reimagined Petitioner's arguments and bolstered them with a subjective and selective take on the record. That isn't how federal habeas review works. This court should reverse and dismiss the petition. And I'll start on the speedy trial front. There are some things that the parties can agree on, and the first thing is that the standard that this court applies when the state courts appropriately identify the Barker Test as the controlling test, and this is from Goodwin at page 247, Edper limits this court's focus to the objective reasonableness of the result of the state court's balancing of the Barker Factors under the facts in Petitioner's case. So, no dispute there. There's also no dispute about the length of time that we're dealing with here. Just over two years, 25 months between December 2006, when the petitioner was arrested, and the trial which took place in January 2009. That 25 months obviously triggered the Barker Factors and a further analysis under the remaining factors, and the parties can agree that it was, because of the length of the time, that it can be weighed against the prosecution, but not heavily. And that certainly was reasonable. I mean, you can take a look at this court's precedents, which say that you have to get to a delay of 28 months before you start putting, or start even thinking about putting heavier weight on the length of time factor. Where the problem starts is at the reasons for delay. And here's what the state courts did. The first 14 months of the delay, the state courts assigned as responsible to the prosecution. And then the next 11 months was assigned to the petitioner because his counsel requested a mental examination. 14 and 11, both sides, and there was no intentional delay by the prosecution that attended the first 14 months. So therefore you have a delay that runs against the prosecution slightly, and a delay that's clearly attributable to the petitioner. You weigh those two together, and the Mississippi Court of Appeals came up with neutral. Is it clearly attributable to the defense, I mean, the defendant? I mean, the district court, as I read what the district court did, basically said there's this systemic breakdown in the, I guess the Hines County Public Defender's Office, and so therefore it should be held against the state. In other words, the state's inability to provide him a lawyer is really the reason for the delay, and of course the district court makes statements about why the mental examination was requested, et cetera. Talk a little bit more about that. I mean, how's the district court on unsound footing? I flag that as the brilliant issue, and there's several reasons that we disagree. The first thing is that, well, obviously, and I'll get to this, there was no systemic breakdown, and there's no proof of systemic breakdown in the record. But here's the problem. That argument is focused on the first 14 months of the delay. The state courts put the first 14 months of the delay, put the responsibility on the prosecution for that, and so what I think the brilliant argument is, is that because there was an alleged systemic breakdown, and because of, and it wasn't a systemic breakdown. It was a communication breakdown between, an alleged communication breakdown between the petitioner and his assigned counsel. But the sum total of it is, is that the first 14 months, the state was responsible for. The petitioner was not without counsel, or was not totally without counsel during that time period. We can see in the record that he had counsel assigned at his preliminary hearing. We can see in the record that counsel was doing things counsel do, filing motions for discovery, appearing at the arraignment. So, and, on top of everything, I guess this cuts right to the heart of it, Judge Wilson, is that there's no proof here of systemic breakdown. There's nothing except proof of a communication breakdown between one criminal defendant and his assigned counsel. And then, you know, an even bigger problem with the district court's approach on the Brillion front is that I don't think that Brillion clearly establishes what a systemic breakdown is, and it certainly doesn't support, I think it actually supports us, because the rule in Brillion is that delays by assigned counsel are attributable to the petitioner, to the criminal defendant. So, on the Brillion front, it actually supports what the state courts did in terms of assigning blame to the petitioner for the second half, for the mental exam that he did. I mean, did the district court explain on this factor why the relevant state court decision is unreasonable application of Barker? Isn't that the standard? That's the standard, and I would say no, Your Honor. With the district court, particularly on the reasons for delay issue, the way the district court saw it was this, or the district court charged that the state court's decision was an unreasonable application of Barker and Brillion in the way that they analyzed the claim. We obviously dispute that. As I said at the beginning, I think it's perfectly consistent with Barker to look at the first 14 months and put the blame on . . . Sure, but we all know, right, this is an AEDPA case. Even if we thought the state court was wrong, that doesn't mean there's an AEDPA violation. Right. It's got to be an unreasonable application. That's right. And when circuit courts do that, the Supreme Court slaps them down without even hearing argument. That's right. So what we have is a general standard, a general constitutional standard that state courts apply routinely every day to speedy trial claims. And as this court has said, as it said in Amos, when you're talking about the Barker test, when you're talking about a speedy trial claim, the deference that's owed the state courts is at its apex. So . . . Well, I guess your position would be that . . . I mean, I'll ask counsel opposite this same question. Hard to say the state court didn't reasonably apply Barker or Breon if there was no evidence in the record of a systemic breakdown. In other words, Breon wouldn't have even come into play, would it have? That's exactly right. And there's certainly no evidence of systemic breakdown. Where did the district court get that then? Well, what we have, I think it's two-pronged. One is there's a newspaper article that's not . . . the actual newspaper article is not in the record, but it's cited in the district court's opinion from about seven years later talking about the Hines County justice system in general. That's certainly not proof of a systemic breakdown at the time that this case was going through the Hines County criminal justice system. And I don't even think it's enough. I mean, that's part of the problem is because of . . . I mean, in addition to the deference ode, I mean, another feature of epideference is that it not only has to be contrary to or an unreasonable application, it has to be clearly established law. And Breon did not clearly establish what kind of facts would make for some sort of systemic or institutional breakdown. And you can clearly see this, I think, if you look to this Court's own case in Boyer v. Vannoy where the allegations there and ultimately, I think, where this Court landed on it was that the funding problems in the Louisiana public defender system at the time was something that was an institutional breakdown. But the Supreme Court didn't resolve that. In fact, in Boyer itself, the Court had granted certiorari to address the question and then decided that the certiorari was improbably granted and sent it back down. But in order to have an unreasonable application of clearly established law, it has to be Supreme Court law. It's not this Court's law. It's not how the Sixth Circuit has viewed an issue. It has to be clearly established by the Supreme Court. On the prejudice issue, we need to speak to that. But it was certainly objectively reasonable for the state courts to reject the petitioner's Ron Ron theory, and there's essentially two reasons. The record certainly supports the conclusion that Ron Ron was just fictitious. Whenever you have claims of a missing witness who never turns up, that claim is always legally suspect. This Court has said so numerous times. The petitioner didn't know Ron Ron's full name. He didn't know his last name. And it wasn't that he knew Ron Ron's name and then he forgot it. But he admitted in trial you can see this – at trial you can see this in the transcript. He never knew Ron Ron's name. Wasn't there some indication that he had his phone number? The testimony was that he had the phone number of Ron Ron's girlfriend and that he had been calling that while – during the first period of time that he was incarcerated. The story was that at some point Ron Ron and the girlfriend broke up and he could no longer get in touch with Ron Ron through the girlfriend. But not only was not knowing Ron Ron's full name, the petitioner was able to identify numerous people at the speedy trial – when he testified at the speedy trial hearing and then also when he testified in front of the jury at trial, he was able to identify numerous people that could have – that were acquaintances with Ron Ron that could have come forward and explained who Ron Ron was or what had happened to him or why he was unavailable. Those weren't put on. If you look at the prosecution's cross-examination of the petitioner at both points in the trial, you can see no effort was ever made. The petitioner talked to Ron Ron on his cell phone. He talked to Ron Ron on landlines. No efforts were made to recover any phone records or anything that was substantiated that those calls ever took place. And I think that this is the most important thing. In the 13-plus years since all of this has gone on, there's never been any proof that Ron Ron ever existed or that – whatever happened to Ron Ron. So we certainly think that based on this record, it was objectively reasonable for the state courts to conclude that the Ron Ron story was not proof that supported the petitioner's prejudice claim. I want to touch on the mental anxiety aspect because this is – Before you go there, let's talk about the ineffective assistance claim. I don't want to short shrift that. Was this a chronic claim or was this a Strickland claim? It was a Strickland claim. That's how the Supreme Court treated it. But you can kind of read what he alleges either way. So what do we do with that? Well, that's the exhaustion point, and I would say – Yes? Our argument on the exhaustion point is that the petitioner was always alleging deficiency and prejudice, deficiency and prejudice, all the way up until the time that the objections were filed from the magistrate's report in this case. But the chronic issue and the chronic angle on this was something that the district court sui sponte brought up on its own. Well, but if he had – if you could read what he alleged before the Supreme Court as a chronic claim – I didn't have counsel. It was so bad, my counsel never responded to me. Whatever he says, I can't remember the exact language. But you can kind of read what he alleges in that petition either way. And the Supreme Court, granted – I mean, at best they gave it sort of very summary treatment. They just said what? Neither prong of Strickland is met. So talk a little bit about how the chronic claim, if it's there – I mean, it's exhausted, right? If we say that we give liberal construction and the chronic claim is there, the Supreme Court doesn't really address it, do they? If it's there, it's still flawed on many, many levels. All right. And that gets us to the ultimate issue on the chronic claim. There's three types of chronic claims. The one that was asserted here was that the petitioner lacked counsel at a critical stage in the proceedings. And in order to be able to make that chronic theory work, you would have to have some clearly established law from the United States Supreme Court that says that the entire pretrial period is a critical stage. There's not any such law. There's not any cited in the district court's opinion. There's not any that's been offered to this court. And there's several reasons that it just wouldn't work. Factually here, he didn't lack counsel for the entire pretrial period. The first part, the first 14 months, he had assigned counsel. Counsel was doing work. The allegation is that the counsel was failing to communicate with him. So factually there's a problem with that. But an even bigger factual problem is during the pretrial period, when Judge Yerger entered the order on the motion on the conflict, he appointed Don Boykin as his replacement counsel. And there's no dispute that he certainly had competent and effective counsel from that point on. So factually there's no chronic problem, even if you buy the rule that was made up and applied here. So I'll take it your position, too, is that that's the case whether we give the Supreme Court deference or whether we don't give deference. That's right. I mean, it's just a flat-out error to – in Woods, most recently in the Langley-on-Bonk, I mean, it's not the rule that state courts have to extend United States Supreme Court precedence. There's no duty to do that. What you have the duty to do is look at existing, clearly established law. There's no clearly established law on chronic that would make chronic fit the facts. Thank you, Mr. Matheny. You'll have time for rebuttal. Ms. Mills. Thank you, Your Honor. Allison Mills for Cedric Russell. I'd like to start with the ineffective assistance of counsel claim. And if I may, I'll address exhaustion first, then the record, which I think is very important to clarify, and then the law, including 2254. First, exhaustion. The question is, did Russell fairly present the issue to the Mississippi Supreme Court? And you asked the right questions. What does the petition say? And so we focus solely on the four corners of his state court petition. That's in the record at page 1594. And what he says is the very first claim of that petition, several times, no lawyer contacted me, court-appointed lawyer, no contact, never contacted, eight different times. He put the issue before the court. And under Black v. Davis, the case that the state relies on primarily for its exhaustion argument, the petitioner there, he said, my counsel was incompetent, unreasonable. He performed unreasonably. That's not this petition. Well, I mean, the counter to that, though, is I guess the most common complaint that every client has about every lawyer that's ever practiced is, my lawyer doesn't call me back. I can't find my lawyer. My lawyer doesn't talk to me when I want to talk to him. He also talks about deficient representation. And you've got to grapple with the fact that counsel was appointed. Counsel filed discovery motions. They may have been pro forma, but I'm not so sure that's different than what would happen. And then there was this, I think, glancingly plea deal negotiation thing that happened, I guess, the day the counsel was substituted. But there's still counsel there. I'll address all of that. How is this not a Strickland deficient counsel claim? I'll definitely address the record because I think counsel might have existed on paper, but I don't think meaningful assistance was there. So this is the case where the lawyer is asleep in trial? This is a case where the lawyer never had a private conversation with the client, if that lawyer was even ever actually appointed. He did file two motions of discovery that were boilerplate, apparently right after indictment, right after arraignment, but there's no order of appointment in this record. But the record indicates that he did have counsel present at arraignment, and I think there was some other, wasn't there another preliminary hearing? Preliminary hearing. There were 11 months there between the preliminary hearing and the arraignment. If that's delay, that's not complete deprivation of counsel. Well, I'll move to the record. I would like to clarify the record because I think the record is very important here. Well, I mean, stick with exhaustion for a second, though. Okay. He's filing pro se pleadings fine. In his pro se pleadings at any stage, does he ever mention Strickland or Strickland problems? Never mentions Strickland. He never mentions chronic. When he objected to the magistrate's report, he doesn't say petitioner has not showed both Strickland prongs? He doesn't use the phrase Strickland prongs? In the federal court, the objections also deny not explicitly cite chronic. The objections responded directly to the magistrate judge's report, but for exhaustion. Go ahead. I'm sorry, but for exhaustion under 2254B, you're solely concerned with what's in the state court petition. Okay, but so even after this, even after your client got a lawyer in the federal court, I recognize this is in the federal court, but did his lawyer say, you know, he's actually been filing chronic claims and you're just dealing with these as Strickland claims. So these are chronic claims, and I'm a lawyer, and so I understand the difference. Did the lawyer do that? The objections say, and specifically the reply brief in support of the objections, say the fatal flaw in every court's analysis to date is that it does not take account for the essential fact that for 14 months Cedric Russell did not have a lawyer. Was it phrased as a chronic claim? The word chronic was never used. Okay, but there's a difference, isn't it? Can't we agree that there is a legal difference, a difference in kind between a Strickland and a chronic claim? Yes, and Black v. Davis says that. But Black v. Davis is an exhaustion case, and the question is did Russell fairly put this question before the Mississippi Supreme Court? And this case is very distinguishable from Black v. Davis because he's very clear that no one ever contacted him. That's a lot different than, for instance, to borrow a phrase from Childress v. Johnson, an opinion of this court, the story of courtroom pratfalls by a hapless lawyer. This is a lawyer who provided, if there was a lawyer, no meaningful assistance at all. But back to the Supreme Court's ruling, neither prong of Strickland is met. And we've got this case, Thomas v. Davis, I guess it's a 2020 case, where we say when a state court rejects a federal claim without expressly addressing that claim, I mean you know this, the court's got to presume that the claim was adjudicated. So when the Supreme Court says neither prong of Strickland is met, does that implicitly reject the chronic argument also? Well, I think— I mean what you get in chronic is prejudice is presumed. That's correct. What you get in chronic is sort of it's so bad, deficient performance, that we're going to just say Strickland's prong one is met, right? Still kind of the same analysis, so did the Supreme Court reject both, whatever it was. Right, and what you have is a summary decision from the Mississippi Supreme Court. Sure. And I— Is that insufficient? I'm sorry? Is that insufficient just as a matter of course? No, the court can—the Mississippi Supreme Court can say what it wants. And I acknowledge that when you have a summary decision of a state court, you may supply a reasonable rationale for that decision. As this review in court, you may do that. I acknowledge that. But only if the rationale is reasonable. And my argument to you is that it is not reasonable given this record. And if I may, I would like to turn to the record, because I think if you look at this record, you cannot arrive at the same decision as the Mississippi Supreme Court. Just one more question on exhaustion. We have plenty of pro se plaintiffs, pro se habeas petitioners, who are going to file pleadings like this. My lawyer didn't do this. My lawyer didn't contact me. I'm upset with my lawyer. Are we going to have to construe every single one of those as maybe bringing a chronic claim as well as a Strickland claim, such that when the state Supreme Court says there's no Strickland error here, then the lawyers are going to be able to come on federal habeas and say, well, there was never any exhaustion of chronic, so no AEDPA. I think it's already that way, Your Honor. I think that Black v. Davis, Childress v. Johnson, they already stand for that proposition. You're not changing the law. You're just applying it. Okay. You can go to the merits. It is not just a claim that he did not have counsel for the first 14 months after his arrest. It is a record fact. Let's start with the preliminary hearing. That was on January 8, 2007. There's actually no official record of that, but we don't dispute it because Russell testified to it, and there's no contrary fact. He attended a preliminary hearing on January 9. A lawyer named Beth Davis was there. That was the first and last time he saw Beth Davis. Fast forward 11 months, his arraignment, November 9. Apparently Frank Williams was there, a lawyer named Frank Williams. That was the first and last time Russell ever saw Frank Williams. Who filed the discovery motions? He did. Who? Frank Williams did, and I'll get to that. November 9, after that, Russell wrote the trial judge and said, I've been here 11 months. A lawyer has not yet contacted me. The trial judge received that message, and this is important. The trial judge said, okay, I'm going to give you a trial date, February 11, 2008. I ask you to look at that order. It's in the record at page 394. What is remarkable about this order is the trial judge signs a certificate of service saying that he is personally sending it to Cedric Russell at the county jail, not to counsel of record because there is no counsel of record. The trial date, February 11, 2008, it comes and goes. There's no trial. There's no contact. Mr. Russell writes the trial judge again, and he says, I didn't even go to court on February 11, 2008. Still, no lawyer has contacted me. For the first 14 months after his arrest, he sat in a county jail, and no lawyer contacted me. Even the magistrate judge says in her report that that fact is unrebutted. When the state says that Russell had counsel, what it means is Russell had counsel on paper, but that's it. The state can point to nothing in this record that would suggest that Frank Williams ever had a private conversation with Mr. Russell. I mean, a private conversation, that's even required by Mississippi rules. Has he provided copies of any motions that were filed? There's no evidence of that. Those two motions of discovery apparently triggered by indictment and arraignment automatically. They're boilerplate. They're identical. They do not evidence any input at all from Mr. Russell, none. By the way, that discovery, no one followed up on that. When the discovery was finally turned over in late February after the trial date came and went, it purported to be medical records for the victim. The records actually predated the incident in question. There's a letter in the record that evidences that. That's at 1565. And I would also direct the Court's attention to the record of Frank Williams' withdrawal, because there is none for Frank Williams in this record. There's simply an order relieving the public defender's office and appointing Don Boykin. This is important. There's no motion to withdraw. There's no notice to Mr. Russell of any motion to withdraw, which is also required by Mississippi rules. That's 7.2d. There's no motion, there's no notice, because there was no lawyer-client relationship. I thought there was a representation made that there was sort of irreconcilable differences between lawyer and client. It says there's a conflict of interest, but there's nothing in the record that substitutes that. Where does it say that? In the order itself, and that order is at 417. But is there anything in the order contradicting that, I mean in the record contradicting that? Well, there's no, well, there's nothing there. I mean, I guess struggling with this a little bit in terms of the deference that we owe to the state court, I'm trying to put myself back in the position of what is the state court to do with all of this? And surely the state court, I mean, we are not required to go behind every order that says whatever, and second-guess what the state court determined, which is neither Prong or Strickland is violated. I'll move on to the law. One more question, though, about chronic, and tell me the case law that we've got that defines the critical stage of trial. In other words, the way the district court defined it, the way you tried to define it is this 14-month period. Thank you, yes. Tell me about that, because I don't read the law so expansively. That's exactly where I would like to go. So, as you know, in every habeas case, the first question you ask is what is the clearly established law? What is the clearly established constitutional law? And here we have the Sixth Amendment right to counsel. It's not just right to counsel. Formal appointment of counsel doesn't cut it. It's assistance of counsel. That's in the Sixth Amendment. If a defendant is actually or constructively denied counsel at a critical stage of the proceedings, prejudice is presumed. That's Strickland. That's chronic. Belle v. Cohn, that was mentioned earlier. That's clearly established. You asked what is a critical stage, and that is the main question here. What we know is that a critical stage is not limited to trial itself. A critical stage is any point at which, quote, a defendant's substantial rights may be affected. Obviously, a plea hearing, an arraignment such as in Childers v. Johnson, that's pretrial, but that hearing obviously is critical. That's a critical stage of the proceedings. Doesn't that say that clearly established law has to be a holding of the Supreme Court? It should be a holding of the United States Supreme Court. Point us to a holding of the Supreme Court of the United States that clearly establishes the critical stage point. I'm sorry? Point us to a holding of the United States Supreme Court that establishes clearly the critical stage point that you're advocating. For the 14 months, I would point to Powell v. Alabama first. Powell v. Alabama says that the pretrial period is perhaps the most critical period when, quote, consultation, thoroughgoing investigation, and preparation are vitally important. Powell v. Alabama decided in 1932. Strickland itself cites Powell v. Alabama for the proposition that this same time period is important. Strickland says the right to counsel presumes that counsel will fulfill certain basic duties, including to consult with the defendant on important decisions and to keep him informed to make reasonable investigations. What is reasonable is determined by information supplied by the defendant. This addresses directly the importance of the time period in question. We're not talking about 14 dead months in the middle of a 10-year-long appeal. We're talking about the critical 14 months after arrest. If you're arrested and thrown in a county jail, the least you expect in the United States is that a lawyer will contact you. You'll get a lawyer. Powell and Strickland are not new cases. I mean, you have to apply them. Powell did the lawyer for the kids in Alabama who were accused of raping a woman, right? Did they have a lawyer who filed discovery motions on their behalf? Actually, that case, the kids were held. No lawyer did anything. They all showed up at trial. Appoint the entire bar to represent them. So that was a joke, right? Yes, it was, yes. And that's a product of his times, too. That's right. No doubt, but that's, so we're in different times now, and that case, anything like this case. But 14 months without a lawyer in a county jail immediately after arrest, that's pretty egregious. That really is that extreme malfunction in the state criminal justice system, that rare case that habeas review is intended to address. Talk about that. Very good question. Where's the evidence in the record of the systemic breakdown? We're kind of crossing over into Barker, but still, it sort of flavors both of the claims here, right? I mean, to the extent the district court found the systemic breakdown, where is that in the record? I think the evidence of the breakdown is a breakdown in the public defender system as it relates specifically to Russell. So I don't have evidence in this record of a broad systemic breakdown that . . . Can a breakdown in one case be systemic? That's a good question. I think that in . . . I think it's a really good question. So, I mean, the question leads right to whether we're in Brillian world or not. The district court said, oh, absolutely, and it was unreasonable for the state court not to apply Brillian here, but you're saying there's no record of a systemic breakdown beyond this case. Well, you're right. The question is how do we define systemic, and if we define systemic as affecting numerous criminal defendants . . . We don't have that in this case, but if we . . . I'm sorry? How much would you define systemic? Well, you could say that the result of systemic problems, institutional problems, meant that in this case, there was a breakdown as it relates to Russell. I think we absolutely have that here. Brillian is a case in which, let's see, that criminal defendant burned through six lawyers in three years, and the Vermont Supreme Court said, oh, well, obviously, this is the state's fault, because they couldn't find a public defender to represent him. And, actually, Justice Ginsburg said, no, this is his fault, because he kept firing his counsel. But, if it had been the case that there was a breakdown in the state's public defender system, then we would have counted that factor against the state. I think that is what we have here. If I may turn to 2254 and D1, D2, because those ultimately are the statutory standards that you have to decide, apply here. The decision of the Mississippi Supreme Court, certainly as it relates to the counsel claim, it is an unreasonable determination of the facts, and that's applying D2, because it does not at all account for the essential record fact that for 14 months, Mr. Russell had no lawyer. It is contrary to the law, that's D1, because it simply says without analysis that he can't establish prejudice, and, of course, under chronic prejudice is presumed. But, also stated another way, the decision is an unreasonable application, and this is Williams v. Taylor, the Supreme Court. An unreasonable application of the Court's clearly established precedent, because it unreasonably refuses to extend clear principles to a new context where it should apply. That's from the United States Supreme Court. And to the extent that you believe, Judge Duncan, that Powell and Strickland and the Supreme Court's cases do not already make clear that this time period is critical, I think we all know common sense. Fourteen months in a county jail without a lawyer is not tolerable in the United States. I'll turn, finally, to the speedy trial claim. I don't have a lot of time. I'll just say that I don't disagree that there is room for agreement there. I don't think we have to talk about length of delay or assertion of the right. Reason for delay, obviously, I would argue that Breon applies here. The prejudice, however, I disagree with a lot of what my opposing counsel said. I would just like to say the record facts are that Russell told Beth Davis at the preliminary hearing about Ron Ron, and she said, no, not now, tell your lawyer. No lawyer came for 14 months. When a lawyer finally contacted him, and that was Don Boykin in late February 2008, Russell told him about Ron Ron and described a house where you might find him. There's a letter in the record. It's at page 434 that evidences those facts. I'm out of time. Thank you. Mr. Matheny, rebuttal. Thank you, Your Honor. Essentially two points. On this chronic issue, there's no case establishing that the entire pretrial period is a critical stage for purposes of a chronic claim. The notion that that's the case would swallow the entire critical stage doctrine. If the whole period of time is a critical stage, there wouldn't be any need for a Supreme Court precedent saying this is a critical stage, this is a critical stage, this is a critical stage. So it would turn that inside out. It would also turn Strickland claims inside out because, as I think has been fairly debated here this morning, I mean, a failure to communicate is probably the most common type of claim that criminal defendants and any kind of lawyers, clients raise. And it's clear here that what we're talking about are deficiencies in the performance of the assigned counsel, not a complete absence of counsel, not a constructive denial of counsel or whatever labels have been tossed around on what happened here. As to the Powell v. Alabama point, I think what's significant there is that Chronic recognized three different types of claims, exceptional circumstances in which a petitioner wouldn't have to prove prejudice. The first one is the critical stage we've been talking about. The other kind, the second one, is when counsel fails to put the prosecution's case to any meaningful challenge to the prosecution's case. That's not what we're dealing with here. The third is the Powell's, and it's where the circumstances were so extreme that it wouldn't matter whether or not the criminal defendant had a lawyer or not. That was the circumstances of Powell. That's what Chronic cited for. And we don't have that here. What we have here is we have 14 months, an alleged communication breakdown. It comes to the court's attention. The state court appoints a replacement counsel. Replacement counsel comes in and, by all accounts, was competent, effective. And that, in and of itself, defeats this idea that there was no lawyer for the entire critical stage of the process for purposes of Chronic. One other point, Speedy Trial was not discussed closely, but I would say this. In my view, the most critical part of the record is pages 551 to 599. It's critical to both claims, but particularly on the Speedy Trial claim. That's where the state trial judge conducted the hearing, the pretrial hearing, on the Barker factors. That's where all of the facts are laid out about this Ron Ron story. That's where all of the facts are laid out about and all the arguments are made about assigning blame here and assigning blame there for the reasons for delay. And I think that that's basically all you have to look at in order to be able to resolve this Speedy Trial claim in our favor. So, with that, we would ask that you reverse the judgment below and dismiss the petition. Thank you, counsel, for a well-argued case on both sides. Call the next case, number 22-50036.